NICHOLS, EXR., APPELLEE, *v.* LOYAL PROTECTIVE LIFE INS. CO., APPELLANT.

(Decided November 6, 1939.)

*Messrs. Newcomer & Parker,* for appellee.
*Messrs. Gebhard & Hogue,* for appellant.

OVERMYER, J. This action was brought by appellee as plaintiff in Common Pleas Court to recover on an

accident insurance policy paying $600 for accidental death, issued to John L. Nichols, father of appellee, in December, 1921, by The Ridgely Insurance Company of Worcester, Massachusetts, which policy was later assumed by the appellant company.

John L. Nichols died on December 28, 1938, and appellee claims his death was due to accidental injuries within the terms of the policy. Decedent had paid premiums from the date of issue to the date of his death. Appellant denies that the insured was injured as claimed, or that he sustained any accidental injuries, or that the injuries he sustained, if any, were the sole cause of his death as required by the policy, and claimed his death was caused wholly or partly by disease.

The only issue on the trial, therefore, was the cause of death of decedent, and on that issue the trial resulted in a verdict for the appellee upon which judgment was entered. Appellant appeals on questions of law, and assigns as errors the refusal of the trial court to direct a verdict for it; that the verdict is not sustained by the evidence and is contrary to law; improper argument to the jury; and failure to grant a new trial.

The policy held by decedent provided in substance for an indemnity of $600 to be paid to the beneficiary in the event of death resulting solely by accidental injuries due to violent external causes and leaving visible marks of wounds or fractures upon the body of the insured.

The decedent, aged 72 years at the time of death, was a printer and newspaper publisher at Stryker, Ohio, and had suffered for some months from myocardial degeneration of the muscles of the heart and had been treated for the same by his family physician, but was not confined to his home—on the contrary, he continued with somewhat reduced vigor his occupation and business activity up to his death. Shortly after midnight on December 28, 1938, he was walking from his print

shop to his home, a distance of a few blocks, accompanied by his son, on sidewalks that were "very icy and slippery" according to the undisputed testimony of a number of witnesses, and when near the private walk leading into his home he fell upon the street sidewalk, causing an open wound on the bridge of his nose, which bled quite freely, bruises on his face and temple, and shock. In a few minutes he was dead.

The only eyewitness to his fall was the son, who, as executor, is appellee herein, and his testimony on the point is briefly this:

"As we came to Depot street we came around the corner, he lit his flashlight and I stepped over on the other side of him, putting him next to the building. After we got beyond Mr. Richards' building he fell forward on his face. I reached for him and couldn't get him in time, couldn't support him in time. *After he fell he raised up and asked for his glasses,* and the light from his flashlight—the glasses hit in front and flashed and I reached down and picked them up and told him he should get up, and I reached over and put my arms around him and he sank on his face on the sidewalk."

The examination of appellee continued as follows:

"Q. Was he conscious again after that? A. No, sir.

"Q. Were his glasses broken when you picked them up? A. They were chipped. * * *

"Q. Did your father say anything after he fell? A. Not a thing. He just said 'Oh.' He said 'Oh' like that and fell.

"Q. Well, did you see exactly the motion of his body as he fell? A. Well, no, because I stumbled at the same time myself or slipped in reaching for him and I didn't—

"Q. Will you tell us please what the condition of the sidewalk was at that point? A. Not only uneven but very icy and it was just around the corner of a building

where the water had congregated there or accumulated there.''

On cross-examination of appellee, the following testimony appears:

''Q. The first thing you noticed about his falling was when he said 'Oh'? A. Yes, sir.

''Q. Did he—and he fell on his stomach? A. He fell forward.

''Q. And he lighted on his stomach? A. He was lying face down on the walk, yes, sir. * * *

''Q. So that you wouldn't say in what manner it was that he fell? A. I saw what manner he fell, certainly.

''Q. After he fell? A. While he was falling * * * I reached for him and couldn't get him. * * * I saw him when he started to fall and when he finished falling, yes, because he bumped into me.''

The decedent's body was carried into his home and laid on a bed. A physician was called, who arrived in fifteen minutes, and upon examination gave his opinion that death had occurred within two or three minutes after the fall. The physician called was the same one who had been treating the decedent for his heart ailment and was and had been for some years the decedent's family physician. We quote from his testimony as follows:

''Q. Could you tell from that examination [brief examination at home] whether or not there was any fracture of the skull? A. No, sir.

''Q. Do you have an opinion on whether or not there was a fracture of the skull? A. Yes, I have.

''Q. What is your opinion on that? A. My opinion is there was a fracture.

''Q. From your acquaintance with Mr. Nichols and your examination of him at that time, what in your opinion caused his death? A. From the appearance of the wounds and blood and so on, it looked to me as if it was caused by the accident—from the fall.

''Q. What was there about the blood or appearance

of the wounds that led you to that conclusion? A. The wound showed some bleeding after the fall.

"Q. And what did that indicate? A. An indication there was some circulation after the fall."

Asked on cross-examination whether it were possible that decedent walking home on the occasion in question, afflicted with his heart ailment, might have fallen over dead, the doctor said: "It is possible, but there are other conditions that would have been different in my mind." Of course, what might be possible is unimportant. The law deals only with probabilities.

. Further, the physician testified:

"Q. Would the bleeding have occurred if he would have been dead when he fell? A. No, sir. Not a surface cut.

"Q. Would there have been black and blue marks formed if he had been dead when he fell? A. No, sir. * * *

"Q. Well, you say the circulation would stop, blood would stop flowing immediately upon death? A. That would all depend on how long the heart worked after he fell."

No autopsy was had upon the body of decedent to determine whether there was a fracture of the skull, but this fact can not militate against the appellee for, by paragraph 8 of the standard provisions of the policy, the appellant company had a right to demand an autopsy if it so desired.

The undertakers, father and son, testified that upon embalming the body of decedent a "purge" or seepage occurred from the right ear, the side upon which the temple and face bruises appeared. They state this as an unusual occurrence, in their experience happening only when there is a fracture of the skull or bursted blood vessel, and in this they are somewhat supported by the opinion of the physician.

The uncontradicted evidence is that decedent "fell" violently, as his bleeding, bruises and wounds would

indicate, and that he did not slump down gradually as if his heart had failed. His hat was picked up some feet away and placed under his head and was later found to have considerable blood on it and inside of it.

Considering the uncontradicted testimony of the son that decedent asked for his glasses after he fell, and the uncontradicted testimony of the physician above narrated, the jury was warranted in finding that decedent was alive when and after he fell, and that the fall was the cause of his death. There is no evidence that he had previously suffered any "heart attack," as that term is known, nor that he had a heart attack on the occasion in question, and the medical evidence shows that the heart condition was no more than a general weakening of the heart muscles due to advancing years.

The evidence clearly supports the inference that he slipped on the ice and fell, and while it is true that because of his heart condition the injuries and shock from the fall may have affected him more seriously than it would a younger and more rugged man, or that a more rugged man might have survived the results of the fall, this would not bar a recovery. See *U. S. Casualty Co.* v. *Thrush,* 21 Ohio App., 129, 152 N. E., 796; *U. C. T. of America* v. *Etchen,* 27 Ohio App., 422, 162 N. E., 636 (motions to certify overruled in each case).

We find that the verdict and judgment are supported by the evidence as to decedent's death being due solely to accidental injuries resulting from violent, external and involuntary causes, and this finding disposes of all assignments of error but one, *viz.,* improper argument to the jury.

On trial the court, at the request of the appellant, submitted certain interrogatories to the jury, and in the closing argument to the jury one of counsel for appellee took up these interrogatories and as a part of his argument stated to the jury what he thought, from his viewpoint and from his interpretation of the evidence, the answers to the interrogatories should be. The

arguments to the jury do not appear in the record and it therefore does not appear what, if anything, may have been said by counsel for appellant in their arguments on the subject. Further, the record shows that no objection to this argument was made at the time and the complaint was first made on motion for new trial. We see no merit in the point made.

No prejudicial error appearing in the record, and the verdict being sustained by the evidence, the judgment will be affirmed.

*Judgment affirmed.*

CARPENTER and LLOYD, JJ., concur.