84 So.2d 130

PROVIDENT LIFE AND ACCIDENT IN-
SURANCE COMPANY

v.

Edrell NELSON, Adm'x.
6 Div. 818.

Court of Appeals of Alabama.

Dec. 13, 1955.

Chas. Tweedy, Jr., and Jim Beech, Jas-
per, for appellant.

Reuben L. Newton and Bankhead & Skinner, Jasper, for appellee.

PRICE, Judge.

This is a suit by Edrell Nelson, as administratrix, etc., claiming for the death of her husband, Columbus Nelson, under a policy of group insurance issued by the defendant. Judgment was rendered for plaintiff and defendant appeals.

The policy insured against loss of life "as the result of bodily injury due to external, violent and accidental means," and further provided that the coverage should not include "any loss caused directly or indirectly, wholly or partly by: (a) Bodily or mental infirmity, ptomaines, bacterial infections (except pyogenic infections which occur simultaneously with or through a cut or wound sustained through accidental means), any other kind of disease, or hernia in any form."

The assignments of error relate to the failure of the court to give the general affirmative charge for defendant and to the overruling of defendant's motion for a new trial.

■ It was said in First Nat. Bank of Birmingham v. Equitable Life Assur. Soc., 225 Ala. 586, 144 So. 451, 453, where the court was considering a policy with a special clause similar to the one in this case:

"Authorities following the doctrine of concurring causes, we believe, uniformly and logically deny liability where, as here, there is an additional clause excluding cases wherein the death results 'directly or indirectly from disease or bodily infirmity,' provided such disease or infirmity was an efficient cause of death." See also Emergency Aid Ins. Co. v. Connell, 258 Ala. 521, 63 So.2d 603.

■ As to the disease or infirmity which must be shown in order to be considered an efficient cause of death under the terms of the specific provisions, in the recent case of Emergency Aid Ins. Co. v. Connell, 258 Ala. 521, 63 So.2d 603, 605, Judge Foster wrote: "We note that in Bergeron v. Prudential Ins. Co. of America, 96 N.H. 304, 75 A.2d 709, 711, it is well said that in order for a condition to be a disease or bodily infirmity within the meaning of such a special clause, there must be 'some ailment or disorder of an established or settled character to which the insured is subject, an ailment or disorder which materially impairs, weakens, or undermines the condition of the insured and is so considerable or significant that it would be characterized as disease or infirmity in the common speech of men."

For the plaintiff, Richard Painter and Carlie Johnson testified Columbus Nelson, while helping to load logs on a truck at the sawmill where he was employed, slipped and fell against a steel bolster on the truck, striking the pit of his stomach about the lower part of his ribs. He stayed at work the remainder of the day, and worked for several days thereafter. On cross examination Painter testified he had seen Nel-

son taking medicine for about a year but didn't know what he was taking it for. Johnson testified Nelson had complained to him at least a year before that he was suffering from high blood pressure and told him the army turned him down in 1944 because of his high blood pressure and that a doctor had told him the high blood pressure was going to kill him sooner or later. On redirect examination this witness stated he was not present when the doctor made these statements and witness was basing his testimony as to the high blood pressure on the complaints and statements by insured and insured did not say when the doctor had told him he was going to die from the high blood pressure, and Nelson was still working when he was hurt.

Felix Stovall testified he owned the sawmill where Nelson worked; he took out a policy of group insurance with defendant covering his employees and Nelson was included in the group, his estate being named as beneficiary. The policy was introduced as an exhibit to his testimony. On cross examination he testified insured worked about eleven days after his fall. Before the injury Nelson told him he was suffering from high blood pressure and had to take off from work quite a bit. He stated when insured was turned down by the army Dr. Shores told witness: "I don't see how the boy is living." A few months before the accident insured said he would have to quit work because he wasn't able to perform his job of sawing on account of his high blood pressure, and witness told him to stay on and keep the saw filed and when he wasn't busy at saw filing he could help load the truck or help cut a road; that after he knew Nelson had high blood pressure he took out the policy of insurance.

The plaintiff testified insured was her husband and that he died November 15, 1950; she was appointed administratrix of his estate. Sometime in October, 1950, her husband came home from work with his chest badly bruised. He was pale, sore, breathing hard, could hardly talk. Seven or eight days later he went to see Dr. Gaines W. Keith.

For the defendant it was agreed between the parties that Dr. Gaines W. Keith being absent from court, his testimony given on a former trial would be read to the jury. The doctor's testimony was as follows:

He was the attending physician at the time of Columbus Nelson's death and signed the death certificate introduced in evidence. The primary cause of death was malignant hypertension, which is a very severe type of high blood pressure with hardening of the arteries; arteriosclerosis being the technical name. He had treated insured for this disease at intervals since March 1946, and insured gave him a history of having had it before then. A cerebral hemorrhage is a blood hemorrhage in the brain caused by malignant hypertension or severe high blood pressure; normal blood pressure would be 120 over 80; insured's pressure ranged from 240 to 300 and sometimes was so high his instruments would not register it; there is no cure for the disease and even with treatment it pursues a rapidly progressive down hill course and the patient invariably dies, either with a hemorrhage or a ruptured ventricle. In his judgment this disease killed Columbus Nelson. On November 6, 1950, insured came to his office with an infection of the right chest wall and said he fell off a truck a week before. He had an abrasion, a temperature of a hundred, with swelling, inflammation and pain. Insured was given penicillin and sulfadiazine. He responded to the treatment insofar as the abrasion and infection was concerned. On November 15 Nelson suffered a cerebral hemorrhage in the witness' office. The abrasion and infection had nothing to do with his death. As to the onset of the cerebral hemorrhage Dr. Keith testified: "Well, in our conversation there I had done written out his return-to-work-slip. He made a statement to me—said 'I feel funny.' I saw that he did—I mean he was—his equilibrium was disturbed, and he had a poor balance. Acted like a fellow would if he was intoxicated. I asked him to stand up and I would help him on the table. He became disoriented in a matter of two or three minutes and he was unconscious I would say within four or five

minutes, and he started having a massive cerebral hemorrhage right while I was talking with him." Insured was carried to a hospital and died some three or four hours later.

On cross examination this witness testified there was redness and inflammation for several inches front and rear and the treatment prescribed for the abrasion and swelling was penicillin and sulfadiazine, or duracillin to be specific, which is a form of penicillin. These drugs are given to eliminate infection as much as possible. On November 8 the sulfadiazine was stopped because it nauseated the patient. The penicillin was given through the 14th, the day before he died. It is always given for about 72 hours after the fever leaves so as to be reasonably sure there will not be a relapse, and the witness knows the infection was eliminated.

Arteriosclerosis is hardening of the arteries brought on by cholesterol deposits, which is a waxy substance which builds up in the walls of the arteries causing them to harden. This waxy substance is not caused by infection. You may have "flaking off" of this substance and get an embolus or an occlusion of the artery. High blood pressure goes along with the arteriosclerosis process. The insured's arteries were very hard. No autopsy was performed. Witness didn't treat insured regularly but treated him at intervals for high blood pressure and arteriosclerosis. If a man has arteriosclerosis in the form insured had it, violent exercise or a blow might lead to his death, but it is not probable. Witness told insured he should quit work because exertion would make him very uncomfortable and might bring on a fatal attack, but he wouldn't be more apt to have a fatal attack doing one type of thing than he would have if he were doing another. If a man in insured's condition had a violent blow, fell down and hit something violently, it could aggravate his trouble and could lead to his death. A severe blow doesn't cause a hemorrhage; pressure is what causes a hemorrhage, and a blow does not aggravate the pressure. If a man has a blow on the head he may

have a hemorrhage from it. Assuming that insured fell and hit a steel bar, a bolster, on the side of a truck, if he had a blow on the head it could aggravate his pressure, and could cause a cerebral hemorrhage if the blow was hard enough. It could cause a cerebral hemorrhage or agitate his high blood pressure if he got a blow right here, but he wouldn't say it would and wouldn't say it couldn't happen. He doesn't know whether this man had any such blow, but insured told him he had an abrasion on his chest wall a week or so before that. Such a blow can lead to infection and this man did have some infection for which he was treated. Infection will agitate blood pressure. It may or it may not cause blood pressure to heighten, and it frequently does. It may have so much infection the patient goes into shock and it will lower his blood pressure and it frequently does both. If a man with high blood pressure has a blow on the head he may have a hemorrhage from it. A man could have ill effects from a blow on the part of his body where the abrasion was found, whether he had high blood pressure or whether he didn't. A blow might affect a fellow as much if he didn't have high blood pressure as if he did. He recommended that insured not do any strenuous work because he fatigued easily and exertion might bring on an attack quicker than he would otherwise have. A violent blow would not be exercise but it might do him harm. Insured did not give a history of a violent blow but gave a history of a skinned place on his chest. Witness, as deceased's attending physician, signed a statement to defendant on August 14, 1951, in which he wrote in answer to the question as to how the injuries were said to have been caused, "Had had a bruise to right chest about two weeks prior to reporting to us; fell off board while loading log." And he signed "claimant's preliminary statement of accident," dated Nov. 18, 1950, showing the nature and extent of the injury as "contusion of chest;" date of accident as October 25, 1950, and dates he treated patient as "November 6, 8, 9, 10, 11, 13, 14, 15, 1950;" that "patient expired 11–15–50." In response to the

question on said form "Is the injury the sole cause of disability," he wrote "during the time he was treated, yes," and "This patient was being treated for the chest injury as stated above and had come to my office on the morning of November 15, 1950, when he suddenly developed a cerebral hemorrhage and died at the Peoples Hospital, Jasper, Alabama, at 1:58 P. M. that day," and stated he wrote "Death was caused by cerebral hemorrhage." The witness said his chart showed that on the 13th and 14th, the last two days before he died, insured was given shots of duracillin every two and a half to three hours, fifty thousand units of the drug in each shot, with four hundred thousand units given at five o'clock to last through the night. The doses were increased the last two days over the previous days in order to speed up the treatment and to be sure he had no relapse. The patient was responding as rapidly as could be expected with what he had to begin with, but the frequency of the dosage was increased to get a higher blood level. He was getting more penicillin the day before he died than on the previous days. On the 10th he was given eight hundred thousand units, which was the largest amount given on any one day, and the next largest amount given was on the 13th and 14th. On the 15th insured came into the doctor's office at 10 or 10:30 and died between one and two. He was not given a shot that morning. The duracillin, penicillin and sulfadiazine were not given for high blood pressure. These drugs were given to kill the infection caused by the abrasion. The 13th and 14th were the only days he was treated as many as four times a day. He did not see him on the 7th or 12th; saw him once each on the 8, 9, and the 11th; twice on the 10th; did not see him on the 7th; saw him once on the 6th, which was the first day he came to the office.

On redirect examination witness testified insured gave no history of a lick on the head. Witness signed the death certificate and put in it that insured died from the cerebral hemorrhage which was brought about by severe high blood pressure for which witness had been treating him over a period of years. Insured's condition was associated with a kidney damage known as nephritis and he ran a four plus albumenuria which goes along with this type of malignant hypertension, and from his examination and treatment of him, it was his judgment that he had a massive cerebral hemorrhage that was due to the severe high blood pressure bursting a leak that caused his death.

On recross examination the doctor stated that what he was testifying to in that connection was his opinion; that he was not present and did not see insured when he died and had not seen him after he left his office three or four hours before he died.

In answer to questions propounded by the court the witness stated that a contusion and abrasion are quite similar. A contusion is a bruise and abrasion means a skin. A contused abrasion is what he actually had. The infection was caused by germs getting into the abrasion which was not treated at the time he got them. Arteriosclerosis would not cause infection. On redirect examination the witness said the infection had nothing whatsoever to do with insured's death and on recross examination he said the hardening of the arteries couldn't cause and didn't cause the infection that witness was giving him all that duracillin for, and again on redirect he stated that a lick to the chest wall, even if it become infected, would have no connection with a cerebral hemorrhage some three weeks after the lick or abrasion on his chest, and if a man had a lick on the head the hemorrhage would start immediately and not three weeks later.

Defendant's witness, Henry Nelson, insured's brother, testified insured had been suffering from a high blood pressure disease for four or five years, and that insured told him he was turned down by army doctors on account of high blood pressure. His brother also told him the doctor said if he didn't quit work he was going to die. The day before he died insured said "he was aiming to try to kill him a squirrel." On cross examination he stated insured didn't tell him he had been squirrel hunting.

It is contended by appellant that Dr. Keith's testimony was direct, positive and emphatic that the death of Columbus Nelson was caused by a brain hemorrhage which was caused by severe malignant hypertension. Also that the death certificate is strong and to the point that the man's death was the result of a disease and not an accident and that Dr. Keith's testimony on the stand was conclusive of this fact.

The weight and credibility of opinion evidence by experts, and the question as to when the general affirmative charge should be given or refused based on such evidence has been considered many times by our courts.

In passing upon the facts the jury, as a matter of law, is not required to accept the conclusion or expressed opinions of expert witnesses, however, such testimony should not be capriciously rejected, but should be weighed in connection with all the facts and circumstances in the case. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524; Booker T. Washington Burial Ins. Co. v. Williams, 27 Ala. App. 393, 173 So. 269; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

Our courts have applied the doctrine that where the definite testimony of an expert is based upon facts such as tests and personal examinations, and when such evidence is uncontradicted, the general affirmative charge, with hypothesis, should be given. Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; Grabove v. Mutual Benefit Health & Accident Ass'n, 241 Ala. 88, 1 So.2d 297.

Under the evidence here, we think it must necessarily be concluded that insured, at the time of his death, was suffering from an ailment of such significant degree as to be characterized as a disease.

We also conclude that Dr. Keith's testimony as a medical expert was definite to the effect that the insured died from the effects of malignant hypertension, and was based on personal observation and examinations. Such evidence was undisputed. Under such circumstances the defendant was entitled to have given at its request the general affirmative charge with hypothesis.

Further, Dr. Keith's statement as to the cause of death is binding on the beneficiary if unrebutted. No contradiction is to be found in any of the evidence. Cotton States Life Ins. Co. v. Crozier, 216 Ala. 537, 113 So. 615; National Life & Accident Ins. Co. v. Puckett, 217 Ala. 110, 115 So. 12; Liberty Nat. Life Ins. Co. v. Trammell, 33 Ala.App. 275, 33 So.2d 479.

For the error of the court in refusing appellant's requested affirmative charge with hypothesis the judgment is reversed and the cause remanded.

Reversed and remanded.