65 N.J. Super. 148 (1961)
167 A.2d 191
JOSEPH W. MAHON, JR., AN INFANT BY HIS GUARDIAN AD LITEM JOSEPH W. MAHON, SR., AND JOSEPH W. MAHON, SR., INDIVIDUALLY, PLAINTIFFS-RESPONDENTS,
v.
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1960.
Decided January 6, 1961.
*151 Before Judges CONFORD, FOLEY and MINTZ.
Mr. N. Louis Paladeau argued the cause for defendant-appellant (Messrs. Carpenter, Bennett and Morrissey and Mr. Richard H. Hughes, attorneys).
Mr. William A. Gillen argued the cause for plaintiffs-respondents (Messrs. Hayden and Gillen, attorneys).
*152 The opinion of the court was delivered by CONFORD, S.J.A.D.
This case entails the difficult and important problem of construction of a common form of coverage clause in an accident insurance policy. Its proper solution requires, in our judgment, a more comprehensive study than any yet undertaken by our courts of the extent to which coverage and exclusion clauses in such policies have made recovery thereon dependent upon the absence of any contributory incidence, to the loss insured, of previous disease, infirmity or illness of the assured.
Plaintiffs bring this action on an insurance policy issued by defendant to recover medical and hospital expenses consequent upon injuries sustained April 16, 1957 by the infant plaintiff (deceased July 6, 1959) as a result of accidentally bumping his head against that of a schoolmate during a recess at the school he attended, St. Mary's Grammar School, South Amboy. The boy was nine years of age at the time. Soon after, he developed symptoms indicating neurological pathology, and was subjected to brain surgery. This revealed an abnormal positioning of the brain stem and evoked a medical diagnosis of Arnold-Chiari malformation, described hereinafter, and suspected brain tumor. The defendant resists recovery on the accident policy on the ground, among others, that plaintiffs' loss does not come within the coverage of the policy.
As evidence of the insurance we have before us only a "certificate of insurance," issued to the infant plaintiff as a student at the school, not the "Master Policy" referred to therein, but both sides have submitted the case on the assumption that this document states the contract coverage, and we deal with it as such, as did the trial court. The certificate certifies that the "insured person" is:
"insured against loss resulting directly and independently of all other causes from injury sustained by such Insured Person in the manner and to the extent herein provided. * * * `Injury' as used in the Master Policy means bodily injury sustained by the Insured Person and caused by accident * * *."
*153 Indemnity under the policy is provided for two kinds of accidental losses: (a) for death, dismemberment and loss of sight, in accordance with a fixed schedule of payments; and (b) for medical, surgical, dental, nurse and hospital expense. It is only the second type of indemnity that is here sought. Plaintiffs recovered a verdict and judgment thereon in the amount of $1,484.
The principal issue raised on this appeal is whether defendant is correct in its contention that the loss in this case was not one which resulted "independently of all other causes" from accidental injury, but at least in part from the pre-existing abnormal condition of the boy's brain, and that it was reversible error for the trial court to have submitted the issue of coverage to the jury and denied defendant's motion for judgment at the end of its case.
The accident in this case occurred when the two boys involved were running, during play, and their heads collided. Plaintiff was the smaller, and the blow raised a "big bump" on his head and a "black and blue" area around his eye. The child was completely free of any physical or health problems before the accident and had been a "very good, healthy, very alert * * * boy." Within a week after the accident he showed symptoms of nausea and lethargy. He had headaches and was unsteady on his feet. Later his vision began to blur. One of the first doctors who treated him, Dr. Hoffman, referred him to Dr. Howard E. Medinets, a neurological specialist and surgeon, who examined him May 26, 1957 at the East Orange General Hospital.
Based upon the history, clinical examination and findings, Dr. Medinets first made a tentative diagnosis of "increased cranial pressure * * * due to either a subdural hematoma [blood clot on the brain] or a tumor of the brain." After testifying to that effect on direct examination as a witness for plaintiffs, the doctor was taken over as a witness for defendant, and testified as follows. He performed two diagnostic operations, one on May 28, 1957, the other May 30, 1957. These revealed "a condition which we call *154 obstructive hydrocephalus which is a condition of dilatation of the fluid space within the brain due to interference with the passageways that normally conduct the fluid from the inside of the brain to the outside of the brain." The reason for the obstruction was discovered by a major cranial surgical procedure performed June 4, 1957. This showed a condition called "the Arnold-Chiari Malformation." The witness described this as a
"condition in which certain portions of the brain are displaced downward. What we call the cerebellar tonsils are displaced downward and downward displacement of the portion of the brain obstructing the flow of the ventricular fluid. It prevents it from coming out of the brain. This condition is due to any of several causes. At times it is congenital; at times it is due to the presence of a brain tumor within the substance of the cerebellum."
The operation consisted of a decompression, or removal of bone around the displaced brain tissue, to relieve the condition mechanically. The interior of the brain was not explored "because there was no reason to increase the neurological deficit, to increase the damage from whatever was lying within the brain substance."
Diagnosis after discharge from the hospital was "an obstructive hydrocephalus and Arnold Chiari malformation; cerebellar tumor suspected but not verified." No subdural hematoma was found. On further examination by defendant, Dr. Medinets stated it as his opinion that this particular Arnold-Chiari malformation was caused by a cerebellar tumor "deep within the substance of the brain." He said tumors are not caused by a "single blow to the head" but can be aggravated by a blow. He thought the tumor and malformation in this case had been aggravated by the trauma of the blow. He explained:
"The situation prior to the trauma was that the tumor was there probably and some Arnold Chiari malformation but still there was enough room for fluid to get out. Following the injury, probably there was some swelling of the tissue with increased Arnold Chiari malformation. Then there was that obstruction and the acute symptoms developed."
*155 He answered in the negative a question whether the condition requiring surgery was "solely the result of the head bumping injury," and in the affirmative an inquiry whether "that condition was the combination of the tumor, the Arnold Chiari malformation and the aggravation when the boys bumped their heads."
On cross-examination by plaintiffs, Dr. Medinets responded affirmatively to questions whether the "blow to the head caused the swelling of the brain tissue" and whether "the swelling of the brain tissue because of its pressure against the remaining brain tissue probably with reasonable medical certainty further herniated the Arnold Chiari malformation." There was a "direct link" between the blow to the head and the increased intercranial pressure. The doctor agreed that prior to the accident the Arnold-Chiari malformation syndrome was in a "quiescent state." The trauma was a "competent producing cause" of the infant plaintiff's intercranial pressure, but, he added on redirect examination, only with the presence of a tumor.
Interrogation by the court brought out the following:
"The Court: The testimony, is, Doctor, uncontradicted that this boy was well and strong and healthy before this happened. And in a matter of a few days trouble developed. What caused the trouble?
The Witness: The trouble was caused by a complete obstruction to the flow of fluid out of the brain. This obstruction was due to pre-existing quiescent abnormalities plus the effects of the trauma.
The Court: Exactly. But it was the effect of the trauma which brought the thing to a head?
The Witness: Yes.
The Court: Without it, it might not have occurred?
The Witness: For a further interval of time."
There was no testimony concerning the nature of the tumor itself, i.e., whether benign or otherwise, or as to its probable prognosis apart from the accident.
A motion for judgment in favor of the defendant on the ground the injury and condition were not covered by the policy was denied, the court stating:
*156 "I am quite sure that the jury has a right to study Dr. Medinets' testimony and decide whether or not the first paragraph of the policy could prevent a recovery in this case."
In respect of coverage, the court charged the jury, so far as here material:
"This is a suit brought under an insurance policy which you will have with you in the jury room.

* * * * * * * *
* * * if there were no other illnesses which the defendant claims was in the case, the money would have been paid.

* * * * * * * *
* * * the defendant claims two things. * * * And in the second place, that this condition which necessitated all or at least the greater part of the treatment was not a result of the accident and injury directly and independently of all other causes.

* * * * * * * *
The second defense which the defendant interposes is that this condition from which the boy was suffering, at least a part of the time, was not caused by the accident itself; that it was not direct and independent of all other causes. I will not attempt to review because you have heard recently the testimony of Dr. Medinets and what he found, and what he said. But it is for you to decide whether or not this injury which this boy sustained and the treatment thereafter including the operation and so forth by Dr. Medinets, was covered by this policy. If you find it was completely covered then your verdict should be for the plaintiff and against the defendant in the amount of $1,520.
If you find it was not then of course your verdict would be no cause of action * * *."
The defendant took exception to the court's letting the "question of construction go to the jury," arguing "there is no dispute in the testimony as to what the condition of the boy was when Dr. Medinets went and opened him up. * * * the construction of the policy is solely within the province of the court."

I.
The parties have tried and argued this case on the assumption that New Jersey law is applicable, and we therefore treat it accordingly.
*157 The much litigated question as to when and the extent to which the presence or contribution of predisposing bodily conditions or diseases affects the right to recovery on an accident insurance policy, or to double indemnity for death by accident on a life policy, see 45 C.J.S. Insurance § 776, pp. 809-814; 29A Am. Jur., Insurance, § 1212, pp. 351, 354; 1 Appleman, Insurance Law and Practice (1941), § 392, pp. 468-473; Annotation 131 A.L.R. 240 (1940); Comment, 21 U. Chi. L. Rev. 266 (1954); Hancock and Grahame, "Are the Courts Destroying the Double Indemnity and Accident Benefit," 1951 Insurance L.J., p. 440, commonly involves one or both of two general kinds of limitation clauses, Hancock and Grahame, op. cit., supra, p. 444. Typical of the first is that found in the instant policy: "loss resulting directly and independently of all other causes from injury * * * caused by accident." Variations in wording are frequent, some policies employing the expressions, "solely," "exclusively" or "sole cause." We refer generally hereinafter to this kind of clause as a "limited coverage" clause. The other, commonly and hereinafter denominated an "exclusionary" clause, and sometimes referred to as a "reduction" or "excepted risk" clause, is typically of the following substantive purport: "* * * which bodily injuries, or their effects, shall not be caused wholly or in part, directly or indirectly, by any bodily or mental disease, defect or infirmity." See Runyon v. Commonwealth Casualty Co., 109 N.J.L. 238, 239 (E. & A. 1932); cf. Kievit v. Loyal Protective Insurance Company, 64 N.J. Super. 537 (App. Div. 1960), certification granted, 33 N.J. 331 (1960).
Although we have before us here for construction only a limited coverage clause, the absence of an exclusionary clause from the policy appears to us a vitally significant factor in the effort to arrive at a construction fairly according with the intent of the insurer in writing it and the reasonable expectations of the assured in buying it. Ambiguities in insurance contracts should be resolved, where reasonable *158 to do so, strictly against the insurer. Hunt v. Hospital Service Plan of N.J., 33 N.J. 98, 102-103 (1960); Yannuzzi v. U.S. Casualty Co., 19 N.J. 201, 207 (1955). In judging the existence of an ambiguity, and seeking clues to meaning, it is fair to look to the familiar and common recourses available to writers of insurance contracts for qualification of liability. For 70 years or more insurance carriers have sought to limit their liability on accident insurance primarily by means of the two general types of clauses indicated, or variants thereof. One type expressly and unmistakably excises from the coverage losses attributable directly or indirectly to bodily disease or infirmity. The other is equivocal as to any comparable effect or intent. This policy was issued in 1956. The availability of such common alternative usages, while not conclusive, is clearly a permissible aid to construction where only one of the alternatives is employed by the insurer. Cf. Slonim v. Globe Indemnity Co., 20 N.J. Super. 594, 599 (Law Div. 1952). See the dissenting opinion of Clark, J., in Bush v. Order of United Commercial Travelers, 124 F.2d 528, 531 (2 Cir. 1942) ("such a clause [exclusionary], far from being `redundant,' puts the purchaser on direct notice that latent defects of the human body may prevent recovery").
While relatively few of the reported opinions draw a clear line distinguishing policies containing limited coverage clauses only, from those containing such a clause and as well an exclusionary clause, most of the decisions involving policies of the former type hold the question of coverage to be one of fact for the finder thereof. Fidelity & Casualty Co. v. Meyer, 106 Ark. 91, 152 S.W. 995, 44 L.R.A., N.S., 493 (Sup. Ct. 1912) (cancerous kidney); Miller v. United Ins. Co., 113 Cal. App.2d 493, 248 P.2d 113 (Ct. App. 1952) (lung adhesion to chest from old injury); Fields v. Metropolitan Life Ins. Co., 132 Conn. 558, 46 A.2d 127 (Sup. Ct. Err. 1946) (cardiovascular disease); Hall v. General Accident Assur. Corporation, 16 Ga. App. 66, 85 S.E. 600 (Ct. App. 1915) (Bright's disease); Continental Casualty *159 Co. v. Lloyd, 165 Ind. 52, 73 N.E. 824 (Sup. Ct. 1905) (tumor around cerebral artery); Inter-Ocean Casualty Co. v. Wilkins, 96 Ind. App. 231, 182 N.E. 252 (App. Ct. 1932) (abnormal appendix); Collins v. Casualty Co. of America, 224 Mass. 327, 112 N.E. 634, L.R.A. 1916E, 1203 (Sup. Jud. Ct. 1916) (abnormally open inguinal canal); Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S.W. 592, 61 L.R.A. 459 (Sup. Ct. 1903) (cancerous kidney); Driskell v. United States Health & Acc. Ins. Co., 117 Mo. App. 362, 93 S.W. 880 (Ct. App. 1906) ("disease" not otherwise described); Wheeler v. Fidelity & Casualty Co., 298 Mo. 619, 251 S.W. 924 (Sup. Ct. 1923) (syphilis and arteriosclerosis); Hoff v. Mutual Life Ins. Co. of New York, 266 Mich. 380, 254 N.W. 137 (Sup. Ct. 1934) (spinal tumor; acute paralysis); Bristol v. Mutual Benefit Health & Accident Ass'n, 305 Mich. 145, 9 N.W.2d 38 (Sup. Ct. 1943) (chronic nephritis and uremia); Nichols v. Loyal Protective Life Ins. Co., 63 Ohio App. 558, 27 N.E.2d 421 (Ct. App. 1939) (heart condition); La Barge v. United Insurance Company, 209 Or. 282, 303 P.2d 498, 306 P.2d 380 (Sup. Ct. 1957) (arthritis); Kelley v. Pittsburgh Casualty Co., 256 Pa. 1, 100 A. 494 (Sup. Ct. 1917) (adhesions of bowels to abdominal cavity); Johnson v. Kentucky Central Life and Accident Ins. Co., 144 Pa. Super. 116, 18 A.2d 507 (Super. Ct. 1941) (heart disease); Foulkrod v. Standard Acc. Ins. Co., 343 Pa. 505, 23 A.2d 430 (Sup. Ct. 1942) (arteriosclerosis); McVeigh v. International Travelers Assur. Co., 101 S.W.2d 644 (Tex. Ct. Civ. App. 1936) (chronic inflammation of appendix); New York Life Insurance Company v. Hoffman, 218 F.2d 465 (6 Cir. 1954) (arteriosclerosis).
The most common rationale for this result is that it is for the jury to find whether the disease or abnormality was not merely a condition, and the accident the proximate (or predominant) cause of the disability or death. See, e.g., Kelley v. Pittsburgh Casualty Co., supra, and the discussion infra. But see, denying liability as a matter of law, even *160 under limited coverage clauses: Smith v. Massachusetts Bonding & Ins. Co., 207 App. Div. 682, 202 N.Y.S. 857 (App. Div. 1924), affirmed per curiam 241 N.Y. 558, 150 N.E. 554 (Ct. App. 1925) (valvular disease of heart and myocarditis); Crowder v. General Accident, Fire and Life Assur. Corp., 180 Va. 117, 21 S.E.2d 772 (Sup. Ct. App. 1942) (calcium deposit in muscle connecting hip to pelvis); Herthel v. Time Ins. Co., 221 Wis 208, 265 N.W. 575 (Sup. Ct. 1936) (heart valves calcified into bone).
On the other hand, a considerably more pronounced tendency to hold for the insurer as a matter of law, if there is uncontroverted evidence of causal contribution by disease or abnormality to the loss, appears in the cases involving exclusionary clauses. So holding in this State is Runyon v. Commonwealth Casualty Co., supra (109 N.J.L. 238); and see Kievit v. Loyal Protective Insurance Company, supra (64 N.J. Super. 537). To the same effect elsewhere are: Provident Life and Accident Insurance Co. v. Nelson, 38 Ala. App. 372, 84 So.2d 130 (Ct. App. 1955) (malignant hypertension); Prudential Ins. Co. of America v. McKeever, 89 A.2d 229 (Mun. Ct. App. D.C. 1952), affirmed per curiam, opinion below 92 U.S. App. D.C. 190, 204 F.2d 59 (D.C. Cir. 1953) (note dissent by Fahy, J.) (heart disease); Brown v. United States Fidelity and Guaranty Co., 336 Mass. 609, 147 N.E.2d 160 (Sup. Jud. Ct. 1958) (angina pectoris; hypertension; coronary insufficiency); Budzinski v. Metropolitan Life Ins. Co., 287 Mich. 495, 283 N.W. 662, 286 N.W. 842 (Sup. Ct. 1939) (cerebral arteriosclerosis); Scharmer v. Occidental Life Insurance Company, 349 Mich. 421, 84 N.W.2d 866 (Sup. Ct. 1957) (coronary arteriosclerosis); Great Northern Life Ins. Co. of Milwaukee, Wis. v. Farmers' Union Co-op. G. Co., 181 Okla. 370, 73 P.2d 1155 (Sup. Ct. 1937) (syphilis); Spangenburg v. Aetna Life Insurance Company, 306 P.2d 707 (Okla. Sup. Ct. 1957) (coronary arteriosclerosis); Britton v. Prudential Insurance Co. of America, 330 S.W.2d 326 (Tenn. Sup. Ct. 1959) (coronary arteriosclerosis); *161 Tucker v. New York Life Ins. Co., 107 Utah 478, 155 P.2d 173 (Sup. Ct. 1945) (diseased aorta; high blood pressure); Evans v. Metropolitan Life Ins. Co., 26 Wash.2d 594, 174 P.2d 961 (Sup. Ct. 1946) ("virulent" arteriosclerosis).
Yet a not inconsiderable number of decisions have held a jury question arises even under the exclusionary clause. Many of these carry over the principle, referred to above in connection with the limited coverage cases, of the accident operating as the proximate or predominant cause of the loss. See, e.g., Brooks v. Metropolitan Life Ins. Co., 27 Cal.2d 305, 163 P.2d 689 (Sup. Ct. 1945) (incurable cancer); Stokes v. Police & Firemen's Ins. Ass'n, 109 Cal. App.2d Supp. 928, 243 P.2d 144 (App. Dept. 1952) (coronary arteriosclerosis); Rebenstorf v. Metropolitan Life Ins. Co., 299 Ill. App. 71, 19 N.E.2d 420 (App. Ct. 1939) (gallstones; weak heart); Police & Firemen's Ins. Ass'n v. Blunk, 107 Ind. App. 279, 20 N.E.2d 660 (App. Ct. 1939) (heart disease); Wolfangel v. Prudential Ins. Co. of America, 209 Minn. 439, 296 N.W. 576 (Sup. Ct. 1941) (syphilis); Kearney v. Washington Nat. Ins. Co., 184 Wash. 579, 52 P.2d 903 (Sup. Ct. 1936) (snow blindness; rheumatism); New York Life Ins. Co. v. Hatcher, 115 F.2d 52 (5 Cir. 1940) (arteriosclerosis; high blood pressure); New York Life Insurance Company v. McGehee, 260 F.2d 768 (5 Cir. 1958) (acute colitis; diabetes; arteriosclerosis).
Some of the exclusionary-clause cases follow the ratio decidendi of the leading New York decision of Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914, 915 (Ct. App. 1930, per Cardozo, C.J.), making recovery depend, even if a pre-existing disease contributes to the loss, upon whether the infirmity is "so considerable or significant that it would be characterized as disease or infirmity in the common speech of men," as distinguished from a predisposing tendency. (Whether a pea-sized duodenal ulcer is a disease or an infirmity is a question for the jury.) McGrail v. Equitable Life Assur. Soc., 292 N.Y. 419, 55 N.E.2d 483 *162 (Ct. App. 1944) (arteriosclerosis); McCarty v. Occidental Life Ins. Co. of Cal., 268 P.2d 221 (Okla. Sup. Ct. 1954) (congenital arterial aneurism); Todd v. Occidental Life Ins. Co. of California, 208 Or. 634, 295 P.2d 870, 303 P.2d 492 (Sup. Ct. 1956) (osteoarthritis).
There is substantial support for the view that the exclusionary clause constitutes a significantly more restrictive contract than the limited coverage clause. The Pennsylvania cases are illustrative. In Kelley v. Pittsburgh Casualty Co., supra (100 A. 494), involving an accident policy with a limited coverage clause like the instant one, the disability resulted from the combined effect of a fall and inflammation of previous abnormal adhesions of the bowels to the abdominal cavity. The court adopted the reasoning of a trial court's opinion upholding a jury verdict for plaintiff. The opinion stressed the absence of the usual type of exclusionary clause, adding (at p. 495), "in other words, this policy does not limit the recovery of indemnity for injuries accidentally sustained solely to those who are bodily sound and truly normal men in the sense that they have no bodily defects." Conceding that if the adhesions had not existed the accident to the plaintiff would not have had any serious results, it was stressed that the adhesions existed "without even the knowledge of the plaintiff and without any inconvenience to him and without in any way disabling him from performing his daily tasks." The court approved a text statement to the effect that (at p. 495) "If disease, while existing, be but a condition, and the accident the moving, sole, and proximate cause of the death, the exception in the policy will not relieve the insurer for death so caused." See also Foulkrod v. Standard Acc. Ins. Co., supra (23 A.2d 430, 433) ("The phrase `resulting directly, independently, and exclusively in death' refers to the efficient, or, as some courts speak of it, the predominant, cause of death"). A sharply divergent view is taken where the exclusionary clause is found. Arnstein v. Metropolitan Life Ins. Co., 329 Pa. 158, 196 A. 491, 493 (Sup. Ct. 1938) *163 ("Had the death resulted from the combination of the injury and the diabetes, and not from the injury alone, then, even though the injury were the proximate and the diabetes merely the remote cause, there would be no liability under the policy."); Real Estate Trust Co. of Philadelphia v. Metropolitan Life Ins. Co., 340 Pa. 533, 17 A.2d 416 (Sup. Ct. 1941) (distinguishing the Kelley case, supra, on the absence therefrom of an exclusionary clause; precluding liability if disease concurred with accident to produce loss; disqualifying disease subjected, however, to test of degree of seriousness stated in New York Silverstein case, supra).
Also making the incidence of the exclusionary clause determinative are First Nat. Bank of Birmingham v. Equitable Life Assur. Soc., 225 Ala. 586, 144 So. 451 (Sup. Ct. 1932); Provident Life and Accident Insurance Co. v. Nelson, supra (38 Ala. App. 372, 84 So.2d 130); Bristol v. Mutual Benefit Health & Accident Ass'n, supra (305 Mich. 145, 9 N.W.2d 38); La Barge v. United Insurance Company, supra (306 P.2d 380); Fidelity & Casualty Co. v. Meyer, supra (106 Ark. 91, 152 S.W. 995, 44 L.R.A., N.S., 493). The Nelson case, supra, held that a contributory disease precluded liability as a matter of law under a policy with an exclusionary clause, while implying that a less strict rule would obtain if a limited coverage clause alone were involved (84 So.2d, at p. 132). The Bristol case, supra, concluded that a fact question of coverage was presented under a limited coverage clause standing alone, where chronic nephritis with uremia (terminal stage), an enlarged heart and sclerosis contributed to death, immediately occasioned by a blow to the head. Previous Michigan cases were distinguished as involving policies with exclusion clauses (9 N.W.2d, at p. 41). The La Barge, supra, disability policy contained only a limited coverage clause. Latent arthritis was activated by a fall. Whether the fall was the sole cause of the disability was held to be for the jury, the court noting that a different result might obtain had the policy contained the exclusionary clause (306 P.2d, at pp. 380, *164 382-383). The Meyer case initiated a line of authority which holds a limited coverage clause standing alone to preclude recovery only in those instances where the loss, disability or death would have occurred at the time it did, notwithstanding the accidental injury. This view concedes, on the other hand, the non-applicability of that doctrine where an exclusionary clause policy is in issue. (152 S.W., at p. 998). See also Illinois Commercial Men's Ass'n v. Parks, 179 Fed. 794 (7 Cir. 1910) (instruction to the effect that insurer was liable if jury found that but for accident assured would not have died when he did, held error, since policy contained an exclusionary clause); Fetter v. Fidelity & Casualty Co., supra (174 Mo. 256, 73 S.W. 592, 61 L.R.A. 459); Driskell v. United Health & Acc. Ins. Co., supra (117 Mo. App. 362, 93 S.W. 880); Hall v. General Accident Assur. Corporation, supra (16 Ga. App. 66, 85 S.E. 600).
A few courts, however, have concluded that the absence of an exclusionary clause is of no matter, the limited coverage clause being regarded as having the same effect in precluding recovery where the accident cooperates with a pre-existing disease. See, e.g., Kerns v. Aetna Life Ins. Co., 291 F. 289 (8 Cir. 1923).
Applying settled principles of construction of insurance contracts already noted, we conclude that the notably greater specificity and breadth of exclusion of losses affected by disease in the exclusionary clause, given broad recognition in the line of cases just discussed, fairly calls for the attribution of a less restrictive intent to a bare limited coverage clause such as that which we have before us here, omitting any reference to contributory disease, infirmity or bodily abnormality as excepted risks. Specifically, we will not hold, against that background of law and insurance practice, that the mere conjunction of disease or abnormality and accident, each "but for" causes of the resulting disability, and neither alone efficient to produce it, necessarily bars recovery in a limited coverage case as a matter of law.
*165 Militating against that result, in addition to the factors mentioned above relevant to the intent of the insurer in drawing the contract, is what we deem the reasonable expectation of the average member of the public buying an accident policy. We think he pays premiums under the assumption that if he sustains an accident which directly subjects him to costly disability he will have indemnity therefor, and not be left empty-handed on the assertion by the company that his accidental injuries are worse than they would otherwise be because of the activation by the accident of a previous physical condition, especially one of which he was unaware and which had not affected him before the accident. It is cardinal in our law that in construing an insurance policy there is a presumption that the insurer intended to have the insured understand that, in event of loss, he would be protected to the full extent that any fair interpretation would allow. Danek v. Hommer, 28 N.J. Super. 68, 76 (App. Div. 1953), affirmed 15 N.J. 573 (1954). The general and New Jersey rule is that "insurance contracts must wherever possible be liberally construed in favor of a policyholder or beneficiary thereof, and strictly construed against the insurer in order to afford the protection which the insured sought in applying for the insurance." Schneider v. New Amsterdam Cas. Co., 22 N.J. Super. 238, 242 (App. Div. 1952).
As stated by the New York Court of Appeals in a cognate situation, "* * * insurance policies upon which the public relies for security in case of an accident should be plainly written in understandable English `free from fine distinctions which few can understand until pointed out by lawyers and judges.'" Burr v. Commercial Travelers Mut. Acc. Ass'n, 295 N.Y. 294, 67 N.E.2d 248, 252, 166 A.L.R. 462 (Ct. App. 1946). And note the observation by Judge Clark, dissenting, in Bush v. Order of United Commercial Travelers, supra, "insurance contracts * * * may easily amount to traps for the uninitiated" (124 F.2d, at p. 531); see also Hall v. General Accident Assur. Corporation, *166 supra (85 S.E. 600, 603); Reiser v. Metropolitan Life Ins. Co., 262 App. Div. 171, 28 N.Y.S.2d 283, 286 (App. Div. 1941), affirmed per curiam 289 N.Y. 561, 43 N.E.2d 534 (Ct. App. 1942) ("a contract insuring against physical disability must be reasonably construed and the meaning of the agreement must not be that of the scientist but that of the average person"); Lewis v. Ocean Accident & Guarantee Corp., 224 N.Y. 18, 120 N.E. 56, 57, 7 A.L.R. 1129 (Ct. App. 1918); Goldstein v. Standard Accident Insurance Co., 236 N.Y. 178, 140 N.E. 235 (Ct. App. 1923).
As long ago as 1932 a leading text stated:
"The policy provision that the injury contemplated must be effected by the specified means, `independently of all other causes,' if understood literally, is so unreasonable and repugnant to the main purpose of the contract, that the courts construe it very strictly against the insurers * * *." Richards, Law of Insurance (4th ed. 1932), § 393, p. 704.
We thus approach the question as to how, with fairness to the assured, and without reading the limited coverage clause out of the policy, we are to determine whether the hospital and medical expenses for which these plaintiffs seek reimbursement constitute a loss "resulting directly and independently of all other causes" from the accident sustained by the infant plaintiff. That the abnormal neurological symptoms displayed by the boy within a week after the blow to the head resulted "directly" from the accident cannot under the testimony be doubted. Whether the result was "independent of all other causes" is the crucial inquiry. Its resolution calls for giving a meaning to the here undifferentiated term, "all other causes," in specific application to a contributing, underlying, latent, abnormal positioning of the brain, not yet productive of abnormal functioning of the bodily unit. And this, as noted above, in the light of the deliberate omission by defendant to include the unequivocally restrictive exclusionary clause in the policy.
*167 In what seems to us a preponderance of American jurisdictions, the test is whether the accidental injury, as contrasted with the contributing disease or bodily condition, is the proximate or predominant cause of the disability or loss, sometimes additionally qualified as the active, efficient, dominant, originating, or direct cause. Pervading such cases is the philosophy that if the accident is a more substantial contributing cause of the resultant disability or death than the disease, the latter being merely a condition thereof, recovery is allowed. In addition to the Pennsylvania line of cases, cited above, this principle was applied in Stokes v. Police & Firemen's Ins. Ass'n, supra (109 Cal. App.2d Supp. 928, 243 P.2d 144); Rinaldi v. Prudential Ins. Co., 118 Conn. 419, 172 A. 777 (Sup. Ct. Err. 1934), apparently modifying the rule of Stanton v. Travelers' Ins. Co., 83 Conn. 708, 78 A. 317, 34 L.R.A., N.S., 445 (Sup. Ct. Err. 1910); Hall v. General Accident Assur. Corporation, supra (16 Ga. App. 66, 85 S.E. 600); Reserve Life Insurance Company v. Poole, 99 Ga. App. 83, 107 S.E.2d 887 (Ct. App. 1959); Rebenstorf v. Metropolitan Life Ins. Co., supra (299 Ill. App. 71, 19 N.E.2d 420); Continental Casualty Co. v. Lloyd, supra (165 Ind. 52, 73 N.E. 824); Metropolitan Life Ins. Co. v. Williams, 180 Miss. 894, 178 So. 477 (Sup. Ct. 1938); Fetter v. Fidelity & Casualty Co., supra (174 Mo. 256, 73 S.W. 592, 61 L.R.A. 459); Driskell v. United Health and Acc. Ins. Co., supra (117 Mo. App. 362, 93 S.W. 880); Roberts v. Woodmen Acc. Co., 233 Mo. App. 1058, 129 S.W.2d 1053 (Ct. App. 1939); Wheeler v. Fidelity & Casualty Co., supra (298 Mo. 619, 251 S.W. 924); Kangas v. New York Life Ins. Co., 223 Mich. 238, 193 N.W. 867 (Sup. Ct. 1923); Moon v. Order of United Commercial Travelers, 96 Neb. 65, 146 N.W. 1037, 52 L.R.A., N.S., 1203 (Sup. Ct. 1914); Graham v. Police & Firemen's Ins. Ass'n, 10 Wash.2d 288, 116 P.2d 352 (Sup. Ct. 1941); New York Life Insurance Company v. McGehee, supra (260 F.2d 768); New York Life Insurance Co. v. Hatcher, supra (115 F.2d 52); *168 New York Life Ins. Co. v. Schlatter, 203 F.2d 184 (5 Cir. 1953); Mutual Benefit Health & Accident Ass'n v. Francis, 148 F.2d 590 (8 Cir. 1945); and see New York Life Ins. Co. v. Wilson, 178 F.2d 534 (9 Cir. 1949). Other courts have expressly rejected the rule of proximate cause. Aetna Life Ins. Co. v. Ryan, 255 F. 483 (2 Cir. 1918); Kingsland v. Metropolitan Life Ins. Co., 97 Mont. 558, 37 P.2d 335 (Sup. Ct. 1934).
The text writers, as well, emphasize the proximate, or predominant cause, approach. 45 C.J.S., op. cit., supra, at p. 812; 29A Am. Jur., op. cit., supra, at p. 351; 1 Appleman, op. cit., supra, at p. 471 ("So it is necessary only that the accident stand out as the predominant factor in producing the loss, and it may combine with any number of other things which hasten the death or the disability * * * [e.g.] if some existing bodily disorder speed the death or contribute to the loss * * *"); Richards, op. cit., supra, at p. 705.
Some courts adhere to a literal or "medical" construction of the limited coverage clause to preclude liability. New York Life Ins. Co. v. Greber, 55 Ariz. 261, 100 P.2d 987 (Sup. Ct. 1940); Penn v. Standard Life & Accidental Ins. Co., 158 N.C. 29, 73 S.E. 99, 42 L.R.A., N.S., 593 (Sup. Ct. 1911); Herthel v. Time Ins. Co., supra (221 Wis. 208, 265 N.W. 575); Bush v. Order of United Commercial Travelers, supra (124 F.2d 528, with dissent by Judge Clark); Crowder v. General Accident, Fire and Life Assur. Corp., supra (180 Va. 117, 21 S.E.2d 772); McMartin v. Fidelity & Casualty Co., 264 N.Y. 220, 190 N.E. 414 (Ct. App. 1934) (a 3-2 decision, Judges Crane and Hubbs dissenting).
A case strikingly similar to that at bar and exemplifying a typical application of the proximate or predominant cause rule is the Indiana decision of Continental Casualty Co. v. Lloyd, supra (73 N.E. 824). The clause there limited liability to bodily injuries which "solely and independently of all other causes, necessarily result in death * * *." *169 The assured fell and struck his head. Death resulted from a cerebral hemorrhage. An autopsy showed a tumor surrounding the cerebral artery, obscuring two inches of it. The contention was that the consequently weakened condition of the artery was one of the causes of death, negating coverage. In rejecting the argument, the court said (at p. 826):
"When two or more causes contribute to an injury, where there is doubt, or the facts of a character that equally prudent persons would draw different conclusions therefrom, in such cases, which of the contributing causes is the efficient, dominant, proximate cause is a question to be submitted to the jury." (Emphasis supplied)
Going on to apply that rule to the facts, the opinion states (at p. 827):
"And it makes no difference whether it [the jury] found that the cause closest the death was hemorrhage of the brain, or an organized blood clot within the walls of the cerebral artery. It had the right to find that the accidental fall was the cause that put his life in jeopardy, because it incited the fatal energy of the tumor, which was at least dormant, and would have remained so for an indefinite period, and, perhaps, until death from some other cause would have supervened. The tumor had impaired the resisting strength of the artery, but had not effected immediate danger to life. It was proper under the evidence for the jury to view the impairment as a condition, and not a cause, and to find that the fall was the originating, efficient, direct, and proximate cause of death; that is, that the fall set in motion a force that progressed upon present existing conditions in natural, usual sequence to effect the fatal result."
In much the same vein is Fidelity & Casualty Co. v. Meyer, supra (106 Ark. 91, 152 S.W. 995, 44 L.R.A., N.S., 493).
The accidental injury as the "predominant" or "dominant" cause of the disability is stressed in the proximate-cause cases as the factor which negates the contribution to the disability of a previous disease as rising to the status of a "cause" exculpatory of liability. Comment, 21 U. Chi. L. Rev., op. cit., supra, at p. 267. As to this, see, in addition *170 to the quotation above from the Lloyd case, Driskell v. U.S. Health & Acc. Ins. Co., supra (93 S.W., at p. 882); Freeman v. Mercantile Mut. Acc. Ass'n, 156 Mass. 351, 30 N.E. 1013, 1014, 17 L.R.A. 753 (Sup. Jud. Ct. 1892); Fetter v. Fidelity & Casualty Co., supra (73 S.W., at p. 595); Metropolitan Life Ins. Co. v. Williams, supra (178 So., at p. 482).
Frequently cited in this connection, although the case is distinguishable on the contract language, is the expression in Freeman v. Mercantile Mut. Acc. Ass'n, supra (30 N.E., at p. 1014):
"Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly considered the cause, and in dealing with such cases the maxim, causa proxima, non remota, spectatur, is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is necessarily to be deemed the proximate cause. It means that the law will not go further back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause of causes beyond seeking the efficient, predominant cause, which, following it no further than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different * * *." (Emphasis supplied)
Apposite to the instant factual situation is the discussion in Wolfangel v. Prudential Ins. Co. of America, supra, involving death from the combined effects of an accidental fall and pre-existing syphilis (an exclusionary-clause case), where, after pointing out that from the medical point of view one cause is seldom "solely" responsible for death, the court noted (296 N.W., at p. 578):
"There can be little doubt that Wolfangel would not have died from the effects of the fall had there been no syphilis in his system. However, before the fall, seemingly, he was a normal, healthy, *171 vigorous individual neither manifesting nor experiencing the existence of any bodily infirmity. Twelve days after the fall he was dead, ravaged by the effects of a very treacherous disease. Notwithstanding complete agreement among all the medical experts that prior to the accident tests would have disclosed the presence of syphilis in the body * * * the fall precipitated a violently destructive process, not usually present in cases where there has been no injury, which effected a transition from the asymptomatic stage, in which the sufferer has no symptoms, into the symptomatic stage, into which, without the fall, Wolfangel might never have gone. A lengthy review of the evidence would not disclose that Wolfangel in absence of the fall was a doomed man * * *. The disease was latent, not manifest."
Study of the cases shows the trend of decision has been toward greater liberality in construing the restrictive and exclusionary clauses of accident and double-indemnity life policies. Compare McVeigh v. International Travelers' Assur. Co., supra (101 S.W.2d 644), with the earlier Texas cases of Western Indemnity Co. v. MacKechnie, 185 S.W. 615 (Tex. Civ. App. 1916), and American National Ins. Co. v. Briggs, 70 S.W.2d 491 (Tex. Civ. App. 1934); compare Thibodeaux v. Pacific Mutual Life Ins. Co., 237 La. 722, 112 So.2d 423 (Sup. Ct. 1959), and Schonberg v. New York Life Ins. Co., 235 La. 461, 104 So.2d 171 (Sup. Ct. 1958), with the earlier Louisiana case of Kirkwood v. London & Lancashire Indem. Co., 14 La. App. 438, 131 So. 703 (Ct. App. 1903); contrast the well-thought-out and moderating opinion in Silverstein v. Metropolitan Life Ins. Co., supra, with the earlier New York case of Smith v. Massachusetts Bonding & Ins. Co., supra (202 N.Y.S. 857); note the difference in approach between Wolfangel v. Prudential Ins. Co. of America, quoted from above, and the prior Minnesota case of White v. Standard Life & Accident Ins. Co., 95 Minn. 77, 103 N.W. 735, modified on rehearing, 95 Minn. 77, 103 N.W. 884 (Sup. Ct. 1905) (where contributing diabetes was "active" prior to the injury); and compare Rinaldi v. Prudential Ins. Co., supra (118 Conn. 419, 172 A. 777) (in effect applying the rule of proximate cause to two differently restricted policies) and Fields v. *172 Metropolitan Life Ins. Co., supra (132 Conn. 558, 46 A.2d 127), with the restrictive construction in Stanton v. Travelers Ins. Co., supra (83 Conn. 708, 78 A. 317, 34 L.R.A., N.S., 445), of a limited coverage clause.
From the foregoing survey, we discern that the proximate cause rationale, as applied to the construction of insurance contracts, differs from its application in tort law. A tortfeasor is liable in invitum for the injury of which his negligence is a proximate cause, notwithstanding other contributing causes are comparatively as great or greater. The inculpating cause need not be "the dominating one"; it may be any cause which constitutes "a substantial factor in bringing about the injury." Hartman v. City of Brigantine, 42 N.J. Super. 247, 261 (App. Div. 1956), affirmed 23 N.J. 530 (1957). An insurer may contract for a more limited liability in insuring the risk of accidental injury or death, but it is up to him to express it with precision. Doubts in the contract he writes are resolved against him. This applies to purported attempts to exclude losses partially attributable to causes other than the accident. The insurer has available at hand the recognized tool for limitation of risk against losses caused or contributed to, directly or indirectly, by disease or bodily infirmity  the common exclusionary clause. His failure to use it creates a fair doubt as to his intent to have its benefit. His resort instead to the comparatively equivocal "independently of all other causes" clause thus warrants the judicial refusal to hold that coverage is intended to be withheld where there is a disease or infirmity contributive to the loss in degree minor to the causal impact of the accident. The proximate cause concept in this context is sui generis, having been evolved by a broad segment of the courts of the nation as a technique to effect a fair resolution between the parties of a dubious contract limitation. A jury finding that the accident is the proximate or predominant cause, in effect relegates the disease or infirmity to a status analogous to that of a "condition" in tort law (which does not relieve the proximate causer of his liability). *173 See Andreoli v. Natural Gas Co., 57 N.J. Super. 356, 366 (App. Div. 1959).
We do not consider that the New Jersey cases on the subject preclude our holding that this State should be aligned with what seems to us the weight of the better-reasoned authority elsewhere  that a limited coverage clause in an accident policy not accompanied by an exclusionary clause permits recovery thereon where the disability is attributable to an accidental injury which is its direct and proximate (in the sense of predominant) cause, notwithstanding "but-for" contribution to that result by a pre-existing pathology, particularly where the condition was dormant prior to the accident and completely without symptoms or effect upon the normal activity of the assured. Of the three significant reported cases, two involved exclusionary clauses. Runyon v. Commonwealth Casualty Co., supra (109 N.J.L. 238); Kievit v. Loyal Protective Insurance Company, supra (64 N.J. Super. 537). In the Runyon case the assured had been suffering from "paralysis agitans" (Parkinson's disease) for eleven years prior to the accident. A fall on an icy sidewalk resulted in a hip fracture. The claim was for the assured's death, which occurred one month and seven days later. The court held that testimony that the disease and the fracture, working in conjunction, caused the death, required a non-suit. The exclusionary clause there involved required that the bodily injuries, "or their effects" (emphasized by the court in the opinion) not be caused "wholly or in part, directly or indirectly, by any bodily or mental disease," etc.
In the recent Kievit case, supra, the exclusionary clause read: "The insurance under this policy shall not cover disability or other loss resulting from or contributed to by any disease or ailment." The assured was struck in the head with a 2 x 4 board. His hospitalization several months later was for a form of Parkinson's disease with psychiatric involvement. The testimony generated a doubt that the disability had any connection with the accident at all and *174 supported the hypothesis of a definite prior psychiatric condition as well as prior Parkinson's disease. The affirmance of the trial judge's factual finding for the insurer (without a jury) was clearly justified either on the exclusionary clause or the deficiency of the proof as to causal relationship between the accident and disability.
An earlier Runyon case involved the same assured and same illness and accident as the Runyon case reported at 109 N.J.L. 238, supra, but a different policy. Runyon v. Monarch Accident Ins. Co., 108 N.J.L. 489 (E. & A. 1932). The policy allowed a death benefit for accidental death resulting "exclusively from bodily injuries caused solely by external, violent and accidental means." This clause, while not specifically excluding contributory disease as an insured risk, differs from that here involved in not referring to "other causes," and in use of the words "exclusively" and "solely." A jury verdict for the defendant was sustained notwithstanding a charge to the jury, paraphrasing the policy language, to the effect that if the plaintiff "did not die solely of the accident which resulted in a fractured hip * * * the beneficiary cannot recover." While this was not a submission of the proximate (predominant) cause rule, the result of the case on a factual basis was probably not contrary to the application of that rule, since the disease there (paralysis agitans  a form of Parkinson's disease) was not latent or dormant, but on the contrary was active, manifest and progressive, with a high likelihood of mortality after an eleven-year history, apart from accident. See 2 Gray, Attorney's Textbook of Medicine (3d ed. 1958), p. 1926. A jury could hardly have found the accident the predominant cause of the death, if instructed on that basis. True, the Runyon court mentions a "general" rule that if the insured was suffering from a disease which aggravated the effects of the accident and "actively contributed" to the death occasioned by the accident, there can be no recovery. Unless understood to mean, by "active" contribution, a proximate, in the sense of predominant, *175 cause, the statement does not reflect what was either then or now the general rule, in application to a limited coverage clause. The court did not distinguish between limited coverage and exclusionary clauses. Of the six cases cited for the so-called general rule, two did not involve the question of contribution by disease at all (the McConkey and Smith cases); the Stanton rule in Connecticut has been, as noted above, modified to the extent of adoption of a species of the proximate cause rule, by the Rinaldi case (118 Conn. 419, 172 A. 777); and the rule of the White case has been completely supplanted in Minnesota by the proximate cause approach of the Wolfangel case, quoted from above. Both the White and Wolfangel cases, moreover, are distinguishable as dealing with exclusionary clauses.
In contrast to the exiguous analysis of the authorities in the Runyon cases is the discussion by Judge Jayne, then sitting in the former Circuit Court, in Cramer v. John Hancock, etc., Ins. Co., 18 N.J. Misc. 367 (Cir. Ct. 1940), involving a double indemnity accident claim under a life policy, with a limited coverage clause like that here involved. The decedent had sustained burns from the contents of an exploding cooking-utensil February 12, 1939, and was discharged from the hospital March 21, 1939. She died April 15, 1939 from causes certified by the attending doctor at the time as cerebral hemorrhage and arteriosclerosis. The formal claim for accidental death benefits was supported by a specification of cerebral hemorrhage as the cause of death, with accidental burns of the face and arms as contributory. The court set aside a verdict for plaintiff as against the weight of the evidence. Although the opinion cites limited coverage and exclusionary clause cases indiscriminately, it concludes that recovery may be had if the accident is shown to have been an efficient and proximate cause of death (18 N.J. Misc., at p. 375), citing the Pennsylvania line of cases, discussed above, stressing that if the existing disease "be but a condition" and the accident the "proximate cause," the "result does not deprive the injury of its distinction *176 as the sole producing cause" (at p. 376). One of the cases cited in Cramer, Kelley v. Pittsburgh Casualty Co., supra, relies upon authorities equating "proximate cause" in this sense with "the predominant cause of death at the time it occurs" (100 A., at p. 495).
Compare Korfin v. Continental Casualty Co., 5 N.J. 154 (1950), involving a life policy with an accidental injury death benefit, recovery being dependent on the injury's being "the sole cause of the loss." Although the litigated question was whether encephalitis from vaccination was an "accidental means" of death, it is of interest that no one raised the question whether decedent's apparent "hyper-susceptibility or allergy" to the vaccine used prevented the vaccination from being considered the "sole" cause of death.
Against the totality of all the authorities, local and out-of-state, we are convinced that the approach we have adopted hereinabove is the one consonant with the recently reiterated declaration of the Supreme Court that "accident disability policies shall be afforded a liberal construction." Dittmar v. Continental Cas. Co., 29 N.J. 532, 542 (1959).

II.
It remains to consider, under this point of the appeal, whether the evidence here adduced required granting defendant's motion for judgment at the end of the case. We think a jury question was clearly presented as to whether the accidental injury was the proximate, in the sense of predominant, cause of the "loss," which, it is again noted, was not the child's death, but the medical and hospital expenditures necessitated by the neurological symptoms which began to appear within a week after the accidental injury. It will be recalled that there were no departures from ordinary good health whatsoever in this boy prior to the accident. They came on with dramatic suddenness soon after. Although an Arnold-Chiari malformation of the brain was previously present, whatever intercranial pressure then existed *177 in nowise interfered with the normal bodily and mental functioning of the child. Although from the later portion of Dr. Medinets' testimony the prior existence of a brain tumor appears to have been a probability, even this factual question was not indisputable, as the forepart of the testimony was that a tumor was "suspected but not verified," and it was conceded that an Arnold-Chiari brain malformation may be due to other causes, sometimes congenital. Nor was it conclusive from the proofs that without the accident the prognosis was necessarily poor. The doctor's testimony that without the trauma "the trouble" might not have occurred "for a further interval of time" is equivocal. The testimony leaves an open question as to whether there would necessarily have been "trouble" later without the accident. There was no testimony, moreover, as to whether the tumor, if any, was benign or malignant, or concerning medical experience or opinion of the probabilities as to prognosis of brain tumors in young children.
The really significant testimony, in the operating surgeon's own words, was that notwithstanding the Arnold-Chiari malformation, "still there was enough room for [cerebral] fluid to get out. Following the injury probably there was some swelling of the tissue with increased Arnold Chiari malformation. Then there was that obstruction and the acute symptoms developed." In other words, the traumatic blow to the head was the sole cause of the "increased intercranial pressure" which in turn produced the symptoms requiring medical care and hospitalization.
From this testimony the jury certainly could have found that a dormant, quiescent abnormality was transformed into a debilitating, incapacitating bodily condition as the direct result of the accident. The consistent holdings of the many decisions cited above, applying the proximate-in-the-sense-of-predominant-cause view of the limited coverage clause, are that in this kind of developmental syndrome the jury may find the loss to have been the direct result of the accident, "independently of all other causes"  that the accident *178 was the direct, proximate and predominant cause of the loss, the pre-existing abnormality only a condition, not a "cause."
We conclude the issue of coverage was for the jury.
However, we cannot affirm the judgment. The jury was left with no guide for decision but its own reading of the policy. In this situation, construction of the restrictive policy language was for the court; otherwise the jury was on an uncharted sea, without compass or rudder. Clearly, the crucial policy language before us, from the standpoint of a lay jury, was ambiguous. It was therefore the court's task to construe it for them. See Maryland Cas. Co. v. N.J. Mfrs., etc., Ins. Co., 48 N.J. Super. 314, 332 (App. Div. 1958), affirmed 28 N.J. 17 (1958); Michaels v. Brookchester, Inc., 26 N.J. 379, 387 (1958). This is not a case in which ambiguous contract language was susceptible of resolution by disputed parol evidence admitted in aid of interpretation, where the question of construction could be left to the jury. Ibid. It is a situation in which construction and explanation must be afforded the jury by the court in order that there may be a rational determination of the disputed issue on a known and definite standard or criterion of decision. At the retrial it will be for the jury to decide whether it was the accidental injury, rather than the pre-existing abnormal condition of the brain, which was the proximate cause, in the sense of the direct, efficient and predominant cause of the condition of the child, which required the incurrence of the hospital and medical expenses. If so, plaintiffs will have established a loss by accidental injury "directly and independently of all other causes," within the meaning of the policy. Otherwise, not. On this issue plaintiffs will have the burden of proof, since it goes to establishment of coverage under the insuring clause of the policy. Kennedy v. U.S. Fidelity, etc., Co., 113 N.J.L. 431, 435 (E. & A. 1934); Brindley v. Firemen's Ins. Co. of Newark, 35 N.J. Super. 1, 7 (App. Div. 1955). Views elsewhere on burden of proof in this field have been collected in Annotation 144 A.L.R. 1416 (1943). The burden *179 may well be different where defendant relies upon an exclusionary clause. Ibid.
The case must be retried because it cannot be said, on the evidence, that a verdict could not properly have been returned for either the defendant or the plaintiffs, within the construction of the limited coverage clause we have held applicable.

III.
Defendant claims it was entitled to judgment as a matter of law because of plaintiffs' failure to give it written notice of claim in accordance with the policy terms. Under the heading "Provisions" in the certificate appears the following:
"NOTICE OF CLAIM: Written notice of claim must be given to the Company within 20 days after the occurrence or commencement of any loss covered by the Master Policy, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the Claimant or the beneficiary to the Company at its Home Office in Reading, Pennsylvania, or to any authorized agent of the Company with information sufficient to identify the Insured Person, shall be deemed notice to the Company."
There follows a provision that "upon receipt of a written notice of claim" the company will supply claimant with forms for filing proofs of loss. Such proofs are required to be filed within 90 days after the date of a loss like that here involved (i.e., other than on a claim for periodic payment).
In actual practice, however, the defendant employs a completely different method of apprising itself of accident claims of insured school children. It distributed a supply of printed "Student Accident Report" forms to Sister Rosemary, principal of the school which the infant plaintiff was attending at the time of the accident. (She constituted the instrumentality through which the group policy covering all the children at the school was effected, premiums were collected and payments forwarded to the company.) The *180 form contains two Parts. Part I is "to be completed by school official," and calls for details concerning the accident and the student involved. It contains the direction: "Complete Immediately after Accident is Reported and Refer to Doctor." Part II is "to be completed by the doctor." This calls for filling in of blanks concerning "Nature of Injury," "Dates of Treatment," "Name and Address of Doctor," and specification of amounts of fees for "treatments." The form thus contemplates that the doctor may be filling it out after more than one treatment has been given.
Analysis of the legal question calls for closer inspection of the progress of the symptoms. When the first symptoms of nausea and fatigue appeared, a few days after the accident, a Dr. Godry was consulted. His diagnosis was a nasal drip, but symptoms continued after treatment therefor. Consequently the parents took the child to Dr. Hoffman. It is not clear from the record just when this occurred, but a bill of that doctor in evidence indicates office visits May 15 and May 23, 1957. His first diagnosis was adenoids. Soon after, the boy's eyes became crossed, and an eye specialist was called in. On the basis of the report of the latter, Dr. Medinets was consulted, and, as noted above, that physician first saw the child May 26, 1957.
Sister Rosemary filled in Part I of the Student Accident Report form the very day of the accident, April 16, 1957, and sent the form home with the child to be filled in by a doctor. The mother of the boy gave the form to Dr. Hoffman to complete. The form, as filled in and signed by that doctor, was introduced in evidence. It refers to dates of treatments, "4/16-17-19/57." The "4" is clearly an inadvertent error and probably means "5." Mrs. Mahon testified she mailed the completed form to the defendant, but could not recall when. There was evidence on behalf of the defendant that it was received June 26, 1957. However, the defendant company admits receiving on June 7, 1957 a bill of the doctors who made X-ray examinations of the boy's skull, dated June 5, 1957. Defendant's claim *181 supervisor testified that as a result of receiving that bill, the defendant wrote to the school (note: not to the Mahons) June 14, 1957, stating it had received "notice of claim," and that upon receipt of "completed claim form," the claim would receive its further attention.
A number of subordinate questions arise in this factual background relevant to the issue of compliance with the policy provision for notice of claim. Since the case must be retried in any event on the liability issue, we notice two such questions not raised or argued heretofore, it appearing to us that the interests of justice call for their consideration at the retrial. The first is whether there has not been a waiver by the defendant of the policy provisions concerning notice in view of the defendant's having put into effect an administrative procedure for apprising itself of accidents and claims emanating from this school, completely independent of and different from the policy provisions. The policy does not call for the company to be notified of accidents, but only to receive a "notice of claim," which contemplates a previous "loss" under the policy, as the notice of claim is to be filed within 20 days after "loss" (or as soon thereafter as is reasonably possible).
Apparently in order to be better protected in connection with school accident claims than it would be if there were only a claim after "loss," which might not ensue until some appreciable time after an accident, the company made the school principal its agent to fill in a report of accident. But instead of directing that report to be returned to it at once, it appended a Part II to be filled in by a doctor after "treatments" and then returned to it. Query, whether the substituted procedure instituted by the company extra the policy provisions has not supplanted, and the defendant thereby waived compliance with, the policy notice provisions, thereby rendering the function of apprising itself of the details of the claim one for defendant to execute, with or without the aid of the school official to whom it furnished the form in the first instance.
*182 The other new issue we notice is in connection with defendant's contention that the policy provisions constituted strict conditions precedent to recovery, thereby rendering applicable the line of decisions following Whittle v. Associated Indemnity Corp., 130 N.J.L. 576 (E. & A. 1943), such as Miller v. Zurich Gen. Accident and Liability Ins. Co., 36 N.J. Super. 288 (App. Div. 1955), and making default in the notice provisions fatal, regardless of prejudice to the defendant. This policy, however, does not in terms make compliance with the notice provision a condition of recovery or describe it as a condition precedent. Since there is no claim or showing that any prejudice to defendant resulted from such delayed notice as this record shows ensued, query whether the decision in Toub v. Home Indemnity Co. of N.Y., 116 N.J.L. 287 (Sup. Ct. 1936), is not applicable. It was there held that no forfeiture of an indemnity policy would result, absent prejudice, from assured's failure to forward suit papers to the home office, where the requirement was not expressly made a condition precedent in the policy. The point not having been argued, we remit its disposition to the retrial.
On the points argued, we conclude there was at most a question for the jury as to whether defendant failed to receive the notice of claim within a reasonable time. It is to be repeated that time did not begin to run with the accident, but only with a loss attributable to the accident, within the policy coverage. The "loss," here, was incurrence of medical and hospital expenses necessitated by the neurological symptoms reasonably attributable to the accident. None of the doctors suspected that connection until the appearance of the crossed-eye symptoms, which was after Dr. Hoffman's initial diagnosis of the malady as adenoids, about a month after the accident. The initial apparent triviality of the accident is a factor in passing upon the reasonableness of any delay in notice. Miller v. Zurich Gen. Accident and Liability Ins. Co., supra (36 N.J. Super., at p. 295). The jury could have found from defendant's *183 letter of June 14, 1957 to the school that it regarded its June 7, 1957 receipt of certain doctor bills as a notice of claim. Even aside from the possible question of waiver discussed above, there was a fairly disputable question as to whether it was not reasonable for the parents of the child to use the company's own form for notifying it of the claim, which entailed waiting until the doctor filled it out, an event which inferably did not occur until at least May 19, 1957.
Moreover, even if the Whittle rule is here applicable, and absence of prejudice is not a mitigating factor (assuming violation of the notice requirement is established), it is nevertheless the rule that in passing in the first instance upon the reasonableness of delayed notice by an insured, absence of prejudice is a factor which may be taken into account. See Miller v. Zurich Gen. Accident and Liability Ins. Co., supra (36 N.J. Super., at p. 296).
Plaintiff has argued that the school principal was the agent of the defendant so as to impute her actual knowledge of the accident to the defendant. However, notice of the accident is not here the issue, but rather notice of the claim. Clearly, the principal was not the general agent of the company merely because she applied for the insurance and collected the premiums from the pupils. Whether the principal was a special agent of the defendant in regard to filing the notice of claim is a question intertwined with that of waiver, referred to above, and must be examined factually in the context of the defendant's having supplied her with the "Student Accident Reports" with directions to have them filled in. The question of special agency may also involve factors of apparent agency or agency by estoppel, having in mind the principal's original authority to fill in blank certificates of insurance and issue them to pupils. The facts in this regard might be clarified at the retrial. See Snyder v. Dwelling House Insurance Co., 59 N.J.L. 544 (E. & A. 1896); Chesansky v. Merchants' *184 Fire Ins. Co., 102 N.J.L. 414 (E. & A. 1925); Yannuzzi v. U.S. Casualty Co., supra (19 N.J., at p. 208).
The question whether there was a failure by plaintiffs to comply with the notice of claim provision of the policy will have to be retried, including, if appropriate, the determination of the new issues which we have noticed. All the issues should be incorporated in a new pretrial order.

IV.
The trial court admitted, over objection of defendant, testimony of Richard Trella, the boy with whom the infant plaintiff bumped heads, indicating that Richard suffered from nose bleeds from time to time after the accident. The court said: "I assume this is to indicate the force of the blow." There was evidence that the boy had nose bleeds before the accident. While such a matter of evidence as this is generally within the discretion of the trial judge, depending upon the probative weight of the proofs in the light of the similarity or differences in the circumstances and the relative absence of prejudice, there would here appear to have been practically no basis for relating Richard's nose bleeds to the severity of plaintiff's injuries. Cf. Stanley Company of America v. Hercules Powder Company, 16 N.J. 295, 312-314 (1954). Of course, Richard may testify at the retrial to such of the circumstances as reflect the severity of the blow in relation to the plaintiff.
Other points of appeal argued need not be considered, as a retrial conformably with this opinion should obviate recurrence of the matters complained of.
Judgment reversed; remanded for new trial.